IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| DENNIS VAN NOTE,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 1:14-cv-01363-JES-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff Dennis Van Note's Motion for Summary Judgment (Doc. 13) and the Commissioner's Motion for Summary Affirmance (Doc. 19). The Plaintiff appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 405(g). This matter has been referred for a Report and Recommendation. Text Order entered 11/30/2015. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Plaintiff's Motion be DENIED and the Commissioner's Motion be GRANTED.[1]

**I**

On June 15, 2011, Van Note filed an application for DIB alleging disability beginning on December 1, 2010. The claim was denied on September 8, 2011, and then denied upon reconsideration on October 14, 2011. On October 25, 2011, Van Note filed a timely request for hearing concerning his application for DIB. A hearing was held before the Honorable Diane Raese Flebbe (ALJ) on February 21, 2013, during which time Van Note was represented by an attorney. Following

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 10) on the docket.

the hearing, the ALJ determined that Van Note was not disabled from December 1, 2010 through the date of the ALJ's Decision (April 18, 2013). Van Note's request for review by the Appeals Council was denied on July 7, 2014, making the ALJ's Decision the final decision of the Commissioner. Van Note filed the instant civil action seeking review of the ALJ's Decision on September 5, 2014.

## II

At the time Van Note applied for benefits, he was 50 years old living with his wife, stepdaughter, and grandchildren in Bloomington, Illinois. On his Form SSA-3368, Van Note stated that the conditions which limited his ability to work were brain aneurysm, depression, anxiety, and headaches. In December 2010, while he was at work as a mechanic/technician-in-charge, Van Note experienced dizziness and was taken to the hospital where a right middle cerebral artery aneurysm was discovered. He underwent surgery to clip the aneurysm on December 8, 2010.

At the hearing, Van Note testified that since he underwent surgery to clip the aneurysm, he has suffered from continued headaches, memory issues, and mental health issues. He testified that sitting too long makes his head hurt, and standing in one place makes him uneasy and his balance becomes uneasy. He explained that he does not lift a lot because he is afraid of what may happen if he were to fall or if his headache pain were to spike while carrying something. Van Note testified that his head condition has caused him to stop playing with his grandchildren, has caused him to stop hunting and bass fishing on his own, and has caused him to stop playing baseball and basketball with his family.

Van Note testified that his sleep has also been negatively impacted by his head problems and that daily tasks like getting dressed and doing the dishes present a challenge because of the amount of bending that may be necessary to complete those tasks. His head problems have caused him to adjust how often

he showers and how and what he cooks. In regard to his mental health, he testified that his head problems cause him to be anxious and nervous while out grocery shopping with his wife, and he is depressed by how his life has changed since the aneurysm surgery.

With regard to the things he previously enjoyed doing, Van Note testified that in order for him to fish with his bass fishing club, they set him up with a partner the last time he went in September 2013. He explained that he continued to play Frisbee golf, though he only goes out to play for a little while. He testified that he can no longer mow his lawn all at one time, and his wife now helps him do it and checks on him constantly while he is mowing. Van Note stated that sitting on the mower caused his head to hurt, necessitating breaks, and the constant vibration of the weed eater caused headache pain as well.

Van Note's wife, Tara Ann, similarly testified that her husband became agitated very easily since his aneurysm surgery. She also testified that he would lose his temper for the mere reason that she asked him how his day was. She explained that his temper becomes even worse if he has a headache. Tara Ann also testified to Van Note's sleeping issues, which she explained were caused by his headaches and stress of the way his life has changed since the aneurysm surgery. She testified that Van Note does not have good stability while standing and that bending makes his headaches severe. Tara Ann further testified that she prevents her husband from doing chores around the house, that mowing the lawn takes her husband all day to finish whereas previously it took him an hour, and that grocery shopping bothers him because of the noises in the store, of the bending to put something in the cart, and of not remembering to get something.

### III

In her Decision, the ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light and medium work as defined in 20 CFR 404.1567(c) except occasional climbing ramps and stairs, balancing, stooping and walking over rough or uneven surfaces; no exposure to hazards such as dangerous machinery and unprotected heights; must avoid concentrated exposure to noise and wetness. Because of deficits associated with aneurysm and distraction from headache pain, the claimant may, during times of symptom exacerbation, have moderate limitations in concentration, persistence, and pace when attempting complex or detailed tasks so he is limited to jobs that do not require complex or detailed job processes, little in the way of change in job process from day to day, and work must be judged only on daily output rather than fast paced hourly product demands; and the claimant is further limited to occasional interaction with the general public.

AR 42. In formulating that RFC, the ALJ detailed the timeline of events from December 1, 2010, when Van Note was brought to the hospital where a cerebral aneurysm was discovered through the time of his aneurysm clipping surgery, and beyond to more recent doctor visits in February 2013. The ALJ recounted Van Note's testimony regarding his reasons for hesitating to return to his previous work, his headache pain levels, his reason for not seeing a psychiatrist, his inability to do activities he previously did because of headache pain, and his pain caused by bending, sitting, and standing. The ALJ cited Van Note's answers in his Function Report, including where Van Note indicated that "some days little things wear me out" and that he engaged in daily activities such as going for walks, watching TV, playing disc golf, fishing, and tinkering in the yard and garage. The ALJ also recounted Tara Ann's testimony regarding her husband's poor sleep, headaches, stress, depression, and balance issues.

With regard to Van Note's complained-of headache pain, the ALJ addressed treatment notes spanning between early 2011 and early 2012, noting

the pain level identified at various times. The ALJ included discussion of the treatment Van Note received for his headache pain and diagnostic testing and objective examination which showed "no structural case for the claimant's alleged residual pain." AR 45. The ALJ next addressed the evidence pertaining to Van Note's complained-of unsteadiness, balance difficulties, and increased memory difficulties. She discussed his follow up to the neurosurgical clinic in December 2010, a June 2011 neuropsychology consultation, an August 2011 consultative psychological evaluation, a December 2011 consultative examination, a treating neurologist's note in April 2012 that Van Note was neurologically intact, and the results of October 2012 and January 2013 examinations of Van Note's balance and ambulation.

The ALJ discussed the diagnostic and objective evidence of record pertaining to Van Note's anxiety and depression, and went into detail about the treatment he received for his mental impairments. The ALJ noted the fact that Van Note was referred to a psychologist in July 2011 and the reason (lack of finances) he gave for not seeing a psychiatrist per treating doctors' recommendations. The ALJ listed Van Note's anxiety and depression medications throughout the period under consideration, and the ALJ noted that Van Note remained on the same medications in the same dosages a year and a half after he complained to the psychological consultative examiner that his medicines were not working.

The ALJ also detailed Van Note's treating neurologist's February 2013 letter which provided a summary of his current course of treatment, all of his alleged ongoing physical and mental impairments, his visits to the Northwestern Medical Faculty Foundation, a recommendation for the use of a pain stimulator, a recommendation to see a local psychiatrist, and the results of subjective and objective testing.

Finally, the ALJ identified the opinion evidence of record, and the weight assigned to each such opinion. It was the opinion evidence of record which the ALJ used to connect the entirety of the record evidence together. With regard to treating doctor Jason M. Seibly, D.O.'s statements in February 2011, the ALJ explained:

> [Dr. Seibly] stated the claimant may take several more month [sic] to improve. (Exhibit 3F/4)  As this opinion was made only two months after the claimant's craniotomy for his aneurysm, the undersigned find [sic] it reasonable and it is given significant weight as a medical opinion from a treating doctor.  Moreover, it is consistent with the claimant's later improvement documents within his treatment records.

AR 47. From her discussion of Dr. Seibly's opinion, the ALJ identified other medical opinion evidence of record that squared with or contrasted with Dr. Seibly's opinion about the trajectory of Van Note's recovery/improvement. For example, the ALJ detailed the results of an examination and recommendations made by Dr. Shanna Kurth, clinical neuropsychologist, in June 2011. Dr. Kurth recommended that Van Note return to work part-time as a mechanic. The ALJ observed that "the claimant's work as a mechanic is skilled work and reasonably found to be more demanding of mental activities than the Residual Functional Capacity conclusion of this Decision." AR 48. The ALJ went on to state that "[w]hile the objective measures of the claimant's cognitive functioning seem well supported by the testing, evaluation and correlation with the claimant's reported activities, the limitation to only part time work is rejected." AR 48. The ALJ emphasized that Dr. Kurth's opinion came just 7 months after Van Note's aneurysm and related surgery. With regard to the August 2011 psychological evaluation done by Dr. William N. Hilger, Ph.D., the ALJ recited Dr. Hilger's GAF assessment for Van Note of 55-60 and gave Dr. Hilger's opinion "significant

weight" where the opinion was based upon personal examination of Van Note by an acceptable medical source. AR 48. In addition to Dr. Seibly's, Dr. Kurth's, and Dr. Hilger's opinions, the ALJ discussed the opinions provided by the State Disability Determination Services doctors and a treating neurologist in May 2011.

After the ALJ issued her April 18, 2013 Decision in which she determined that Van Note was not disabled from December 1, 2010 through the date of her Decision, Van Note appealed the Decision. In the July 7, 2014 Notice of Appeals Council Action denying Van Note's request for review of the ALJ's Decision, the Appeals Council (AC) explained what it considered when it looked at his case. The AC was provided with evidence from Dr. Mark Amdur, M.D., dated September 2 and 7, 2013, which was not before the ALJ because it was dated more than four months after the ALJ's April 18, 2013 Decision. The evidence included Dr. Amdur's September 7, 2013 Psychiatric Evaluation, a September 2, 2013 addendum to the Psychiatric Evaluation, and a second addendum to the Psychiatric Evaluation dated September 2, 2013.[2] In the first addendum, Dr. Amdur cites a "CT Angiography head, 3/5/12" which noted "an area of encephalomalacia and gliosis" and opines that those notes are the "smoking gun" which provide "more than sufficient explanation for memory impairment, executive function deficits, attention deficits, mood and personality change." AR 15. Dr. Amdur further opined that the loss of brain tissue could "certainly affect how Mr. Van Note perceives pain," and his "[c]redibility should no longer be an issue." AR 15.

The AC particularly identified the evidence provided by Dr. Amdur, noted that the ALJ decided Van Note's case through April 18, 2013, and concluded that the "new information" was about a later time and so it did not affect the decision

---

[2] It does not escape the Court's notice that Dr. Amdur identified as "addendum[s]" documents that pre-date his evaluation of Van Note.

about whether Van Note was disabled beginning on or before April 18, 2013.  AR 2.

## IV

Van Note argues:  1) the Appeals Council erred by failing to remand Van Note's case for consideration of the new and material evidence from Dr. Amdur; 2) the ALJ erred on her selective consideration of the medical evidence and failing to build a logical bridge from the evidence to her conclusions; and 3) the ALJ's credibility determination was not supported by substantial evidence.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other

9

type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Van Note first takes issue with what occurred before the AC. He also takes issue with the ALJ's consideration of the evidence that was before her in making a residual functional capacity finding, and thus Van Note claims error by the ALJ at Step 4.

## A

Initially, Van Note argues that the AC erred by rejecting Dr. Amdur's September 2013 report and addendum to that report (collectively "report"). Van Note specifically argues that Dr. Amdur's report related back to his condition prior to the hearing before the ALJ, was "new," and was material. The Commissioner disputes that Dr. Amdur's report was time relevant. The Commissioner argues that even if the AC may have erred in failing to note that the addendum was time relevant the error was harmless because Dr. Amdur's report was not "new."

The AC Notice stated, in relevant part:

We also looked at evidence from Dr. Mark Amdur dated September 7, 2013 (13 pages). The Administrative Law Judge decided your case through April 18, 2013. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before April 18, 2013.

AR 2. 20 C.F.R. § 404.970(b) provides:

If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the

10

>administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

Thus, only evidence that is new, material, and related to the period on or before the date of the ALJ's hearing decision qualifies for AC consideration. *Id*. Because the AC determined that Dr. Amdur's report was non-qualifying under 20 C.F.R. § 404.970(b), the AC's determination is subject to review for legal error. *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015). The AC did not err in concluding that Dr. Amdur's report did not affect the decision about whether Van Note was disabled beginning on or before April 18, 2013.

While Van Note argues that Dr. Amdur's report related back to his condition prior to his hearing, was based on the same symptoms that he had been complaining about since his aneurysm, and was based on new conclusions drawn from a CT taken prior to Van Note's hearing, the Commissioner only goes so far as to concede that the AC may have erred in failing to note that at least the addendum to Dr. Amdur's report (wherein the March 2012 CT angiography was addressed) was time relevant. Van Note provides no authority for his assertion that an examination done *more than four months after* the ALJ's Decision is time relevant. In any event, as the Commissioner argues, the entirety of Dr. Amdur's report is not "new" and so any error the AC made in rejecting Dr. Amdur's report was harmless.

"New" evidence means evidence not in existence or available to the claimant at the time of the administrative proceeding. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997), citing *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). Here, Dr. Amdur's September 2, 2013 addendum to his report discussed the "CT Angiography head, 3/5/12" notes that were already in the record the ALJ had before she issued her decision. Though the addendum was not actually in existence or available to Van Note at the time of the administrative

proceeding, it was just a different interpretation made months after the ALJ's decision by one of Van Note's medical providers based upon review of old evidence. Van Note argues that Dr. Amdur undertook his own examination of Van Note, and thus his report was informed by his own clinical examination and not merely a new perspective on old records. That argument is unpersuasive. To consider such evidence "new" under § 404.970(b) would corrupt the process both in regard to the newness requirement and timing requirement; Social Security claimants could obtain remand by simply obtaining a different, favorable interpretation, based in part upon examination conducted *after the date of the ALJ's decision*, of evidence that was already before and considered by the ALJ, albeit in the form of "new" evidence. In reality, under such a scheme there would be no end to the administrative process. Van Note cites to no authority which would suggest that § 404.970(b) should be read so liberally as to permit potentially endless supplementation of the record.

### B

Van Note also argues that at the hearing level, the ALJ erroneously weighed and considered the medical evidence and opinions of record. He argues that the ALJ's ultimate RFC conclusion resulted from selectively assessing the record and failing to see the full picture. The Commissioner argues that contrary to Van Note's assertions, the ALJ's conclusion that he was not disabled was based upon an extensive review of the evidence as a whole and, far from discussing only evidence in favor of denial, the ALJ thoroughly explored the evidence.

Van Note argues, in particular, that the ALJ overly relied upon Dr. Seibly's opinion, considered particular medical evidence to the exclusion of evidence showing disability, ignored doctors' notes and assessments, placed undue emphasis on a GAF score, and failed to take his dizziness and unstable balance

properly into account. In assessing medical opinion evidence, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Here, the ALJ did not err in her assessment of the medical opinion evidence. It is clear from the ALJ's articulation of her reasons for crediting Dr. Seibly's opinion (that Van Note would take several more months to improve) that the ALJ considered the requisite factors under 20 C.F.R. § 404.1527. The ALJ noted Dr. Seibly's opinion was entitled to significant weight where it was a medical opinion from a treating doctor, was found reasonable as it was made only two months after Van Note's craniotomy for his aneurysm, and was consistent with Van Note's later improvement documented within his treatment records. AR 47.

Similarly, the ALJ explained that she disagreed, in part, with the DDS physicians' opinions but that they deserved "some weight" where there "[existed] a number of other reasons to reach similar conclusions (as explained throughout [the] decision." AR 47. Throughout the Decision, the ALJ discussed the medical evidence of record in conjunction with Van Note's subjective complaints, his reports of daily activity, objective test results, and recommendations for future treatment. The ALJ directly addressed Dr. Kurth's June 2011 examination and recommendation for Van Note and explained her departure from Dr. Kurth's recommendation where Dr. Kurth's opinion came only seven months post-surgery and so did not meet the durational requirement of the Act.[3]

---

[3] *See* 42 U.S.C. § 423(d)(1)(A) (explaining that he plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to

13

In the same way that the ALJ articulated her reasons for crediting Dr. Seibly's opinion and the other opinions of record, the ALJ articulated her consideration of the medical evidence and opinions generally. She did not highlight only those portions of the record that showed Van Note's improvement. Instead, the ALJ cited treatment notes that spanned from early 2011 to early 2013 and which revealed both improvement of Van Note's headaches as well as continued complaints of headache pain. The ALJ cited diagnostic testing and objective examination that were done during that time which showed "no structural case for [Van Note's] alleged residual pain;" normal verbal and visual recent memory; "mildly variable attention concentration in the context of otherwise preserved cognitive functions;" normal gait and posture; and flat affect and quiet and passive demeanor. AR 45-46. The ALJ also cited Van Note's subjective complaints to medical sources during that time including continued headaches with "intermittent severe pain;" poor short-term memory; dizziness; imbalance and unsteadiness; some change in his behavior; and suicidal ideation. AR 45-47. The ALJ detailed what Van Note's doctors and examiners recommended as treatment for Van Note and the extent to which they observed the conditions of which he complained. She also noted Van Note's medications, the fact that he told a psychological consultative examiner that his medicines were not working, and the fact that Van Note remained on the same complained-of medications one and a half years later.

As for the GAF score of 55-60, the ALJ discussed the psychological evaluation by Dr. Hilger that contained that GAF score and she stated that, "This opinion is given significant weight as it is based upon personal examination of the claimant by an acceptable medical source. It is consistent with the mental

---

result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months).

status examination documented within this report and the reports by the claimant of his own functioning as described in Function Reports detailed above." AR 48. It is apparent that the ALJ did not place an undue amount of emphasis on Van Note's GAF score where her discussion of it reveals that the ALJ considered and accepted the entirety of Dr. Higler's opinion and even then, only after she considered treating doctors' and consulting doctors' opinions, Van Note's own statements and representations, and the objective medical evidence (both showing improvement and showing continued complaints).

Contrary to Van Note's arguments, the ALJ considered the record evidence in its entirety rather than selectively. Perhaps Van Note would have preferred for the ALJ to go into greater detail about his continued complaints of headache pain and the treatment he sought for it, his suicidal ideation, and his feelings of instability, but the ALJ was not required to discuss every piece of evidence. The detail the ALJ *did* provide was sufficient to show that the ALJ did not ignore an entire line of contrary evidence and provided a logical bridge between the evidence and her conclusions, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); it is obvious why the ALJ gave the weight she did to the medical opinions of record and why she determined the medical opinions supported a "not disabled" conclusion. She gave "significant weight" to Dr. Seibly's opinion, and her discussion of the record evidence in general reveals how the ALJ determined that the entirety of the record evidence squared with Dr. Seibly's opinion. The ALJ distilled the record medical evidence in a way to show the full picture of Van Note's condition and how that reconciled with the RFC she formulated.

## C

Van Note argues that the ALJ committed a second error by failing to support her credibility assessment with substantial evidence and instead based it on a legally and factually flawed analysis. Similar to the argument he makes

with regard to the ALJ's consideration of the medical evidence, Van Note argues that the ALJ cherry-picked the record and ignored evidence supporting his claims of pain. The Commissioner counters that the ALJ properly assessed Van Note's credibility and described her analysis in her Decision.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ must provide "enough detail and clarity to permit meaningful review." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). A credibility finding "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

Here, Van Note takes issue with the ALJ's consideration of his activities of daily living, pain complaints, and his efforts to obtain mental health treatment. Notably, Van Note highlights via his arguments of error that the ALJ *did* at least consider the relevant factors under the regulations: activities of daily living, allegations of pain, and treatment (or lack thereof). *See* SSR 96-7p. The ALJ's discussion of Van Note's activities of daily living, nevertheless, leaves a bit to be desired. The ALJ did a mediocre job of placing Van Note's activities of daily living in the correct light; Van Note's own reports and testimony of how he did those activities indicated limitation beyond that which could be gleaned from the

16

ALJ's recitation of those activities. Her discussion of Van Note's daily activities therefore makes it unclear whether the ALJ recognized the difference between activities of daily living and activities in a full-time job. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

However, the ALJ's less than perfect discussion of Van Note's daily activities does not preclude the Court finding that substantial evidence supports the ALJ's credibility assessment. The ALJ's conclusions regarding the other evidence of record pertaining to Van Note's pain allegations and his efforts to seek mental health treatment were amply supported by the record evidence and were specific enough for the Court to understand her reasoning. True, the ALJ did note where the objective medical evidence did not provide support for Van Note's pain allegations and where examination of his physical movements showed normal results, but the ALJ also discussed the testimony and record evidence which revealed that Van Note continued to experience headaches, sought additional treatment for headache pain, and as late as February 2013 considered the future use of a pain stimulator. Again, the ALJ is not required to discuss every piece of evidence as long as she provides some glimpse into her reasoning. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

The ALJ, in black and white terms, explained why she discredited Van Note's representations that he did not seek treatment by a psychiatrist because he could not afford to do so. The ALJ stated:

> The claimant testified (as discussed two paragraphs down) his treating doctors have recommended he see a psychiatrist, but he claims he does not have the finances to do so. (Exhibit 22F/2; 23F/8). While the undersigned is sympathetic to the claimant's allegations of limited resources, the claimant demonstrated the ability to travel to and undergo repeated examinations and testing at the Northwestern Medical Faculty Foundation in Chicago, Illinois,

17

in 2012 and early 2013, which suggests the claim that psychological treatment is financially unattainable is not entirely credible.

AR 46. In considering and explaining her reason for finding Van Note's explanation for failing to seek more psychological treatment, the ALJ complied with SSR 96-7p's directive that:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

Van Note seems to argue that an ALJ must consider endless reasons for why a claimant fails to pursue additional medical treatment for his claimed disabling conditions. Plf's Reply (Doc. 22 at pg. 6) ("The ALJ's conclusion overlooks several other possible explanations of Van Note's financial situation . . . ."). Van Note does not direct the Court to any authority which provides that the ALJ must expressly consider in her Decision every conceivable reason for why a claimant fails to pursue additional medical treatment before determining that the claimant is less credible. Here, the ALJ considered the explanation Van Note provided, and the ALJ explained why such an explanation was not entirely credible. The ALJ met her obligation under SSR 96-7p.

Ultimately, the ALJ's credibility determination is supported by substantial evidence because she reached that determination only after considering the relevant factors as they applied to the record evidence, and by doing so, she clearly articulated her consideration in a way to permit the Court meaningful review. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be

reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (citation omitted). Here, the ALJ's credibility finding was both reasonable and supported.

## V

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 13) be DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 19) be GRANTED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on February 9, 2016.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE